513 S.E.2d 296 (1999)
350 N.C. 153
STATE of North Carolina
v.
Melanie Sammons ANDERSON.
No. 60A97.
Supreme Court of North Carolina.
April 9, 1999.
*301 Michael F. Easley, Attorney General, by Gail E. Weis, Assistant Attorney General, for the State.
Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, Durham, for defendant-appellant.
ORR, Justice.
Defendant was indicted 30 January 1995 for first-degree murder and felonious child abuse. In September 1996, defendant was tried capitally and found guilty of first-degree murder on the basis of malice, premeditation and deliberation; on the basis of torture; and under the felony murder rule. She was also found guilty of felonious child abuse. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment accordingly. The trial court also sentenced defendant to three years' imprisonment for felonious child abuse.
After consideration of the assignments of error brought forward on appeal by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we find no error meriting reversal of defendant's convictions or sentences.
The victim, Tabitha Pierce, was two and one-half years old at the time of her death. Tabitha's uncle, Ronald Pierce, lived with defendant, who was his girlfriend. In July 1994, defendant and Pierce visited Tabitha's parents in Pennsylvania. Tabitha's mother agreed to let Tabitha come to North Carolina and stay with defendant and Pierce for several weeks. On 24 August 1994, defendant and Pierce took Tabitha to Wilkes Regional Medical Center. Tabitha was unconscious, and her body was covered with bruises, grab marks, pinch marks, scratches, bite marks, and other injuries. Tabitha was airlifted to the pediatric intensive care unit at Baptist Hospital in Winston-Salem because of the severity of her injuries. On 25 August 1994, Tabitha died after life support was withdrawn.
Defendant told the nursing supervisor at Wilkes Regional Medical Center that earlier in the evening, she had found Tabitha outside, with a dog standing over her. However, she told the registration clerk at the hospital that she heard a gasp in the bedroom and found Tabitha in her room making a "gurgling" sound. Defendant said that she grabbed and shook her and that Tabitha collapsed on the bed. She also claimed that Tabitha had slid on wet carpet, causing the bruises on her face. Defendant and Pierce together later recounted the evening's events to Karolen Bowman, M.D., an expert in pediatric medicine at Wilkes Regional Medical Center. They told her that Pierce ran outside when he heard dogs barking and found Tabitha limp and making gurgling noises, whereupon they then brought her to the hospital. Pierce and defendant also stated that Tabitha bruised easily.
When David Pendry, a detective with the Wilkes County Sheriff's Department, questioned Pierce and defendant at the hospital, defendant agreed with Pierce's explanation that a dog jumped on Tabitha and knocked her down. Pierce stated that when he went outside, he found Tabitha lying on the ground, unconscious and not breathing. They then brought her to the hospital. Defendant later told another law enforcement officer that both Tabitha's old and new injuries were caused when a dog jumped on her and knocked her down.
Defendant's former mother-in-law, Lucille Macemore, testified that some time after 11:00 p.m. on 24 August 1994, defendant called her from Wilkes Regional Medical Center and stated, "Lucille, I've killed Tabitha."
The State's evidence tended to show that Tabitha had numerous injuries extending all over her body, including bruises on her face, cheeks and jaw, chin, forehead, sides of her neck, collarbones, over the front of her chest, on her back, over her right flank, her buttocks, upper and lower legs, her eyelid, and on her shins. Patches of her hair had been pulled out traumatically. Tabitha had also suffered injuries caused by a blunt trauma to *302 the mouth. There was evidence of forceful pinching and grabbing and human adult bite marks on Tabitha's body. She had suffered a blunt trauma to her pubic area. Dr. Patrick E. Lantz, the forensic pathologist, found bruises in the forms of grab marks, belt marks, shoe marks, and marks from a radio antenna and a metal tray. Tabitha's brain was swollen with a hemorrhage both over the surface of the brain in the lining as well as a subdural hematoma between the skull bone and the brain. There were retinal hemorrhages in the back of her eyes indicating that she had been shaken violently. Dr. Lantz opined that these injuries had been inflicted at various times, would have been painful, and would have required considerable force.
William Fisher, M.D., the resident family doctor at Wilkes Regional Emergency Department, testified that he did not believe Tabitha's injuries were caused by a dog, but instead by "some sort of a beating." Dr. Bowman testified that, based on her observations and on the history given to her by Pierce and defendant, she believed that Tabitha had "been severely abused over a matter of days to weeks." Sybille Sabastian, a registered nurse in the Wilkes Regional emergency room, opined, based on her experience and her observations of Tabitha's injuries, that Tabitha "had been beaten." Sarah Sinal, M.D., an expert in pediatric medicine who saw Tabitha in the pediatric intensive care unit at Baptist Hospital, testified that, in her opinion, Tabitha was "a victim of severe child abuse." She concluded that Tabitha was a victim of the shaken-baby syndrome and the battered-child syndrome. Dr. Lantz testified that, in his opinion, Tabitha's injuries were not caused by a dog, that the injuries were inflicted at various times, and that Tabitha was a victim of battered-child syndrome.

PRETRIAL ISSUES

I.
In her first assignment of error, defendant contends that the trial court erred in denying her motion for expert psychiatric assistance. Defendant argues that an expert was needed to present evidence that defendant was acting under the domination of Ronald Pierce and that she was under duress at the time of Tabitha's death. Upon consideration of a medical report from Dorothea Dix Hospital during an ex parte hearing, the trial court denied the motion on the grounds that defendant's sanity was not likely to be an issue in the case. Defendant argues in her brief that she is entitled to a new trial because the trial court's denial of expert psychiatric assistance deprived her of her constitutional rights to the assistance of counsel and a fundamentally fair trial. We disagree.
Turning first to a defendant's entitlement to expert psychiatric assistance, in State v. Page, 346 N.C. 689, 488 S.E.2d 225 (1997), cert. denied, ___ U.S. ___, 118 S.Ct. 710, 139 L.Ed.2d 651 (1998), we stated:
In accordance with Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)], this Court has held that upon a threshold showing of specific need for expert assistance, funds for such must be made available. Further, the statutory right to "counsel and the other necessary expenses of representation," N.C.G.S. § 7A-450(b) (1989), includes the assistance of experts upon a showing of a particularized need therefor. The trial court has authority to approve a fee for the service of an expert witness who testifies for an indigent person.
To establish a particularized need for expert assistance, a defendant must show that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that the expert will materially assist him in the preparation of his case. Although particularized need is a flexible concept and must be determined on a case-by-case basis, [State v.] Parks, 331 N.C. [649,] 656-57, 417 S.E.2d [467], 471 [ (1992) ], "[m]ere hope or suspicion that favorable evidence is available is not enough to require that such help be provided," State v. Holden, 321 N.C. 125, 136, 362 S.E.2d 513, 522 (1987), cert. denied, 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 935 (1988). The trial court has discretion to determine whether a defendant has made an adequate showing of particularized need. In making its determination *303 the trial court should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made.
Page, 346 at 696-97, 488 S.E.2d at 230 (citations omitted).
During the ex parte hearing prior to trial, defendant offered into evidence a report from Dr. Robert Rollins, a forensic psychiatrist, and a report from Dorothy Humphrey, the staff psychologist, both of whom worked at Dorothea Dix Hospital. In his report, Dr. Rollins determined that defendant has "limited intellectual ability"; that she is "capable of proceeding to trial"; and that she "[d]oes not have a disorder that would relieve her of responsibility for her actions." Ms. Humphrey reported that defendant "has an IQ of 75 to 76" and that "her expressed concern and affection for her children appear genuine." During the ex parte hearing, the following exchange occurred:
MR. CAMERON [defense counsel]: ... Well, my main point was, I suppose, Your Honor, to stress the things in the report itself, such as the borderline intellectual ability, and the fact that ... and, I'm not sure I understand all this, in which they say "the principal and primary diagnoses" and then it goes on to say "mixed personality disorder with inadequate (sic) dependent (sic) and emotionally unstable features."
You know, of course, this trial, as it now stands, would be a two part trial. We, perhaps, may need the psychiatric report for the second phase more so than even the first phase. But, we are concerned to some degree with the first aspect of the trial in anticipating the State's theory, they may have to put this, since ... she's not the mother of the child, that they may consider her to be in position of being, having parental control, and thus, being in a position of a parent, which may place a greater responsibility on her to act if the situation developed there in which the child was in danger by someone else, she might be in a position of, if the State were going on that theory that she was in a position of a parent, that this would require some action on her part. And, perhaps her low IQ and emotional stability and fear of this other individual might, would prevent her from acting as a parent would have, or should have.
THE COURT: Any, any evidence now, other than this report?
MR. CAMERON: I do not, we do not intend to put the Defendant on the stand, Your Honor, but I think, as I say, the report speaks for itself in that respect.
We're just anticipating a little bit of what the State might do. I don't know if it intended to join them for trial, but I've not, you know, if they were joined, it may be more reason at that point, at that time, to have a psychiatrist review to show why she may not have stepped in and done more than she did on that occasion.
THE COURT: You're not, you didn't file notice that you were going to plead insanity, not guilty by reason of insanity did you?
MR. CAMERON: No, sir. No, sir.
The trial judge then made the following findings:
The Defendant is present with counsel at the ex parte hearing, offered into, the Defendant offered into evidence the report of Dr. Rollins, a forensic psychiatrist from Dorothea Dix Hospital, and from the staff psychologist Dorothy Humphrey, and upon a careful consideration of the report, the Court finds that the Defendant has not made a threshold showing that her sanity is likely to be a significant factor in her defense, and the Court specifically finds that there's no evidence to support a finding that fundamental fairness requires any appropriation to provide access of this Defendant to another psychiatrist; that the Court finds, determines and concludes that the evidence offered by the Defendant in this case does not ... entitle the Defendant to the assistance of an expert funded by the State to prepare for her defense, specifically, that ... the threshold showing of specific necessity has not been met. The motion of the Defendant for the appropriation of funds to allow the Defendant to undergo psychological and/or psychiatric testing is DENIED.
*304 Applying the principles of Ake to the case at bar, we find that the trial court did not abuse its discretion in denying defendant's motion for psychiatric assistance. In determining whether an indigent defendant is entitled to expert psychiatric assistance, defendant must make the "`threshold showing to the trial court that [her] sanity is likely to be a significant factor in [her] defense.'" State v. Pierce, 346 N.C. 471, 481, 488 S.E.2d 576, 582 (1997) (quoting Ake, 470 U.S. at 82-83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66). To the contrary, defense counsel here conceded that defendant was not going to raise an insanity defense. Moreover, defense counsel's request for assistance was based on mere speculation of what trial tactic the State would employ rather than the requisite showing of specific need. Thus, we conclude that the trial court did not abuse its discretion in denying the motion because "the evidence presented by defendant does not approach the showing found sufficient by the Supreme Court of the United States in Ake or by this Court in [State v.] Gambrell [, 318 N.C. 249, 347 S.E.2d 390 (1986) ]." Id. at 484, 488 S.E.2d at 583.
This assignment of error is overruled.

II.
In her second assignment of error, defendant contends that she is entitled to a new trial because the trial court erred in denying defendant's pro se motion to have attorney Bradley Cameron relieved of representing her in this case. We disagree.
On 26 August 1994, Mr. Cameron was appointed as defense counsel for defendant. On 6 February 1995, defendant wrote a letter to a district court judge complaining that she "felt in the dark about her case" because she had seen and spoken to Mr. Cameron only a few times. She wrote that Mr. Cameron had not tried to meet her needs in the case, and thus, she requested that a new attorney be appointed. Chief District Court Judge Edgar B. Gregory responded to her letter on 7 February 1995, explaining to defendant that her case was in Superior Court and that any motion regarding her representation should be directed to Superior Court Judge Preston Cornelius.
Defendant's arraignment was subsequently held on 21 February 1995 with Judge Cornelius presiding. However, defendant did not raise any concerns about Mr. Cameron at this hearing. Then on 3 April 1995, defendant wrote a letter to Judge Cornelius reporting that Mr. Cameron had visited her only once in jail. She complained about Mr. Cameron's qualifications and again requested that he be dismissed from her case. Defendant sent the same letter to Judge Rousseau on 16 April 1995.
On 21 April 1995, Judge Rousseau addressed defendant's concerns about Mr. Cameron in court. The following exchange took place:
THE COURT: You're being held on murder charges, I believe, is that correct?
DEFENDANT ANDERSON: Yes, sir. Yes, sir.
THE COURT: Well, you're charged with first degree murder?
DEFENDANT ANDERSON: Yes, sir.
THE COURT: You have written me several letters here this week. What, what do you want to say about them?
DEFENDANT ANDERSON: I just don't feel like I'm getting done right. I haven't seen my attorney that much.
THE COURT: Well, one of your attorneys has been involved in a murder case that's been on this week. What do you [sic] lawyers say about it? I believe you say they had a Rule 24 Hearing?
Mitch McLean, who had been appointed as second counsel in defendant's case, stated that because of a conflict of interest, he had been permitted to withdraw from the case, and that he had gone to the jail to explain the situation to defendant. Judge Rousseau then addressed defendant:
THE COURT: ... [M]a'am, do you understand that Mr. McLean can't represent you?
DEFENDANT ANDERSON: Yes, sir.
THE COURT: What do you say about Mr. Cameron?
DEFENDANT ANDERSON: I've just been in there for eight months and I hadn't seen my attorney that much.

*305 THE COURT: Well, you know he can't stay with you every day?
DEFENDANT ANDERSON: Yes, sir, I know that.
THE COURT: He's got other things to do, and he's been working on this other murder case.
DEFENDANT ANDERSON: Yes, sir.
THE COURT: And, of course, your case can't be tried probably until the other case is tried.
DEFENDANT ANDERSON: (Nods head affirmatively).
THE COURT: The one we were on this week (sic). And, I'll have to appoint another lawyer if ... Mr. McLean's gotten out.
MRS. HARDING [prosecutor]: Yes, sir.
THE COURT: Anything else you want to say about it, ma'am?
DEFENDANT ANDERSON: No, sir.
THE COURT: Well, I'll see about getting you another lawyer as soon as I can.
DEFENDANT ANDERSON: Thank you, sir.
Attorney Donna Schumate was later appointed as second counsel. On 19 August 1995, the matter of representation again arose in front of Judge Thomas W. Seay, Jr. When Judge Seay reviewed defendant's court file and saw the letters she had written to Judge Rousseau in April, he inquired if she intended to pursue her motion to dismiss Mr. Cameron from her case. Mr. Cameron responded that he was aware of the letters, but he had never spoken with defendant about them. The court pursued the matter as follows:
THE COURT: All right, then this is Melanie, Melanie Sams (sic) Anderson, will you stand, please?
DEFENDANT ANDERSON: Yes, sir. (Standing).
THE COURT: Is it, then you say you, in your latest letter, April 20th, says, "I ask that you please have Brad Cameron dismissed from my case."
DEFENDANT ANDERSON: Yes, sir, I did. I was brought over here one time in front of Judge Rousseau....
THE COURT: ... about this?
DEFENDANT ANDERSON: About this.
THE COURT: About this letter? And, it was resolved at this time?
DEFENDANT ANDERSON: Yes, sir. I wasn't aware, you know, that Mr. Cameron was handling the Munsey murder, and handling several cases at the time....
THE COURT: .... but, Judge Rousseau has already disposed of these motions then?
DEFENDANT ANDERSON: Yes, sir. Yes, sir.
THE COURT: Well, if he's disposed of it, that's the way it is.
DEFENDANT ANDERSON: Thank you, sir.
Defendant now contends that she was never allowed an adequate opportunity to be heard on her complaints regarding Mr. Cameron. After a thorough review of the record, we conclude that the trial court did not err.
"A cardinal principle of the criminal law is that the sixth amendment to the United States Constitution requires that in a serious criminal prosecution the accused shall have the right to have the assistance of counsel for his defense." State v. Hutchins, 303 N.C. 321, 335, 279 S.E.2d 788, 797 (1981). "While it is a fundamental principle that an indigent defendant in a serious criminal prosecution must have counsel appointed to represent him, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), an indigent defendant does not have the right to have counsel of his choice appointed to represent him." State v. Thacker, 301 N.C. 348, 351-52, 271 S.E.2d 252, 255 (1980).
In the case before us, defendant was granted a fair opportunity to be heard on the matter. Further, based in part on her assurances to Judge Rousseau on 21 April 1995, defendant appeared to be satisfied with the trial court's resolution of her representation. During the 19 August 1995 exchange with Judge Seay, defendant did not ask that the court reconsider the motion, nor did she bring any additional concerns about Mr. Cameron before the court. Thus, without a *306 request for Judge Seay to consider the issue de novo, Judge Seay properly left the matter as Judge Rousseau had resolved it.
"The competency of a criminal defendant's counsel does not amount to a denial of the constitutional right to counsel unless it is established that the attorney's representation was so ineffective that it renders the trial a farce and a mockery of justice." Hutchins, 303 N.C. at 335, 279 S.E.2d at 797.
Thus, when it appears to the trial court that the original counsel is reasonably competent to present defendant's case and the nature of the conflict between defendant and counsel is not such as would render counsel incompetent or ineffective to represent that defendant, denial of defendant's request to appoint substitute counsel is entirely proper.
Thacker, 301 N.C. at 352, 271 S.E.2d at 255. Nothing in the record indicates that Mr. Cameron was not qualified to represent defendant in this case. Nor is there any evidence that Mr. Cameron did not serve as a zealous advocate for defendant throughout the entire time in which he represented her. In sum, "[a]t no place in the record is there any evidence which would tend to show that defense counsel were unable to mount a defense which would be consistent with the concept of effective representation." Hutchins, 303 N.C. at 336, 279 S.E.2d at 798.
The hearings conducted by Judges Rousseau and Seay "fulfilled the obligation of the court to inquire into defendant's reasons for wanting to discharge [her] attorney[ ] and to determine whether those reasons were legally sufficient to require the discharge of counsel." Id. at 335, 279 S.E.2d at 797. This Court has stated that a defendant does not "have the right to insist that new counsel be appointed merely because he has become dissatisfied with the attorney's services. Similarly, the effectiveness of representation cannot be gauged by the amount of time counsel spends with the accused; such a factor is but one consideration to be weighed in the balance." Id. (citations omitted).
Therefore, we conclude that defendant's complaints about Mr. Cameron's allegedly insufficient representation did not entitle defendant to have Mr. Cameron dismissed from this case. "Because of the potential these challenges have for disrupting the efficient dispensing of justice, appellate courts ought to be reluctant to overturn the action of the trial judge in disposing of the matter." Id. at 337, 279 S.E.2d at 798. The trial court properly denied defendant's pro se motion to have her attorney removed from her case.
This assignment of error is overruled.

III.
Next, defendant argues that the trial court erred in ruling that the defense could not make reference to the trial of Ronald Pierce, who was tried separately for the murder of Tabitha in October 1995.
On 16 September 1996, the State filed a motion in limine requesting that the trial court prohibit defendant from referring to Ronald Pierce's convictions for first-degree murder and felonious child abuse. After hearing from both the prosecution and defendant, the following exchange took place:
THE COURT: Well, at this time, I will DIRECT that you not mention anything about the Pierce trial.
Now, if you call him as a witness, we'll have to see at that time what we're going to do.
MR. CAMERON: If we get, again, another matter, Your Honor, let's say we've got a witness testifying somewhat different from what they testified earlier.
THE COURT: Well, what the jury did in the Pierce [trial] is immaterial to what the jury might do in this case. And, results of a jury verdict is (sic) immaterial in this case, period.
MR. CAMERON: I understand about the results, but I, I think it may well be pertinent to other matters, though, Your Honor.
THE COURT: Well, what the jury did is immaterial. She's to be tried on this case. The State has the burden of proof on this case. And, what the State might have proven in the other case does not bear on what the State might prove in this case.

*307 MR. CAMERON: And, again, I say, Your Honor, this motion was filed this morning, and it didn't meet....
THE COURT: ... well, in the interest of justice, I will say....
MR. CAMERON: ... whose justice?
THE COURT: Huh?
MR. CAMERON: In whose justice ... not this Defendant's justice.
THE COURT: In the interest of justice, I will DIRECT that you not mention it until it comes up, and we'll look at it if it does come up some other time.
MR. CAMERON: I understand.
Defendant claims that the trial judge's ruling denied her of her constitutional rights to present a defense, to due process of law, and to be free from cruel or unusual punishment. However, in her brief, she concedes that "[t]he trial court's ruling that the result of the Pierce trial was irrelevant may have been correct." Defendant further argues, though, that as a result of the trial court's ruling, she was essentially prevented from cross-examining adverse witnesses about their testimony in Ronald Pierce's trial. We disagree.
First, careful review of the record reveals that the trial court ruled only that defendant could not refer to the results of the Pierce trial. The trial court did not prohibit defendant from impeaching adverse witnesses whose testimony was different from that in the Pierce trial. In fact, the trial judge stated, "I will DIRECT that [the defense counsel] not mention [the Pierce trial] until it comes up, and we'll look at it if it does come up some other time." After carefully reviewing the record, however, we find no point during the trial at which the defense counsel asked the trial court to revisit the issue of references to the Pierce trial, nor has appellate counsel for defendant pointed to one.
Second, defendant failed to assign error to any restriction on her cross-examination of witnesses. Defendant did not specifically raise this issue with the trial court during the examination of these witnesses for its consideration, nor did she include this issue in her assignment of error that she presented to this Court.
This assignment of error is overruled.

IV.
In her next assignment of error, defendant contends that the trial court erred in allowing the prosecutor to stake out prospective jurors by asking them, "[W]ould the fact that the Defendant is a female[ ] in any way affect your deliberations with regard to the death penalty?" We disagree.
The purpose of voir dire is to ensure an impartial jury to hear defendant's trial. The voir dire of prospective jurors serves a two-fold purpose: (I) to determine whether a basis for challenge for cause exists, and (ii) to enable counsel to intelligently exercise peremptory challenges. The trial court has broad discretion to ensure that a competent, fair, and impartial jury is impaneled. "[D]efendant must show prejudice, as well as a clear abuse of discretion, to establish reversible error." State v. Syriani, 333 N.C. 350, 372, 428 S.E.2d 118, 129, cert. denied, [510] U.S. [948], 114 S.Ct. 392, 126 L.Ed.2d 341 (1993), reh'g denied, [510] U.S. [1066], 114 S.Ct. 745, 126 L.Ed.2d 707 (1994).
State v. Gregory, 340 N.C. 365, 388, 459 S.E.2d 638, 651 (1995) (citations omitted), cert. denied, 517 U.S. 1108, 116 S.Ct. 1327, 134 L.Ed.2d 478 (1996).
Defendant cites to the holdings in State v. Davis, 325 N.C. 607, 386 S.E.2d 418 (1989), cert. denied, 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990), and State v. Johnson, 317 N.C. 343, 346 S.E.2d 596 (1986), in support of her contention. However, both Davis and Johnson involved voir dire of prospective jurors in which the defendant attempted to ask hypothetical questions involving the existence of a mitigating circumstance. In the case sub judice, the prosecutor's questions were not impermissible hypothetical questions "`designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts.'" Johnson, 317 N.C. at 383, 346 S.E.2d at 618 (quoting State v. Vinson, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), death sentence vacated, 428 U.S. 902, 96 S.Ct. 3204, 49 L.Ed.2d 1206 (1976)). An inquiry into the possible sensitivities of prospective *308 jurors toward a female defendant facing the death penalty was not an inappropriate effort to ferret out any prejudice arising out of defendant's gender. As we have previously stated, "the prosecutor here was simply inquiring into the sympathies of prospective jurors in the exercise of his right to secure an unbiased jury." State v. McKoy, 323 N.C. 1, 15, 372 S.E.2d 12, 19 (1988), sentence vacated on other grounds, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Defendant has shown no abuse of discretion.
This assignment of error is overruled.

V.
In her fifth assignment of error, defendant asserts that the trial court erred in sustaining the prosecutor's objection to questions posed by defendant to prospective jurors about their religious beliefs. We disagree.
This Court, in State v. Cummings, 346 N.C. 291, 312, 488 S.E.2d 550, 562 (1997), cert. denied, ___ U.S. ___, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998), stated that "[p]rospective jurors in a capital case must be able to state clearly that ` "they are willing to temporarily set aside their own beliefs [concerning the death penalty] in deference to the rule of law."` State v. Brogden, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993) (quoting Lockhart v. McCree, 476 U.S. 162, 176 [106 S.Ct. 1758, 1766-67], 90 L.Ed.2d 137, [149-50] (1986))."
While a wide latitude is allowed counsel in examining jurors on voir dire, the form of the questions is within the sound discretion of the court. "In this jurisdiction counsel's exercise of the right to inquire into the fitness of jurors is subject to the trial judge's close supervision. The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion." State v. Bryant, 282 N.C. 92, [96,] 191 S.E.2d 745[, 748] (1972), cert. denied, [410 U.S. 958, 93 S.Ct. 1432, 35 L.Ed.2d 691, and cert. denied,] 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973).
Vinson, 287 N.C. at 336, 215 S.E.2d at 68.
In the present case, defendant attempted to question prospective jurors about their church membership and whether their church members ever expressed opinions about the death penalty. The trial court properly exercised its discretion in regulating the voir dire by prohibiting such questions.
This Court has stated that "defendant's right of inquiry ... is the right to make appropriate inquiry concerning a prospective juror's moral or religious scruples, beliefs and attitudes toward capital punishment." Id. at 337, 215 S.E.2d at 69. Here, defendant's questions did not make appropriate inquiry regarding the prospective jurors' religious beliefs or their ability to impose the death penalty or a life sentence. Instead, defendant inquired about the prospective jurors' church affiliations and the beliefs espoused by others affiliated with or representing their churches regarding the death penalty. These questions in this case fall beyond the scope of appropriate questions regarding the specific jurors' moral or religious views and were properly prohibited by the trial court. See State v. Lloyd, 321 N.C. 301, 307, 364 S.E.2d 316, 321 (holding "that the trial court properly prohibited the defense counsel's inquiry into the religious affiliations and practices of prospective jurors"), sentence vacated on other grounds, 488 U.S. 807, 109 S.Ct. 38, 102 L.Ed.2d 18 (1988).
Further, defendant was able to determine whether the prospective jurors would consider a life sentence by asking if they would automatically vote for the death penalty. Abuse of discretion has not been shown where "the defendant was able to elicit the information necessary to select competent, fair and impartial jurors without questioning [prospective] jurors about their personal religious beliefs and affiliations." Id.
This assignment of error is overruled.

GUILT-INNOCENCE PHASE

VI.
Defendant next argues that the trial court erred in allowing the State to present evidence that defendant punished her daughter by hitting her with a belt and punished her son by biting him. The trial court conducted a voir dire to determine the admissibility of the disputed evidence. After listening *309 to arguments from defendant and the State, Judge Rousseau concluded that the testimony was admissible pursuant to Rule 404(b) of the North Carolina Rules of Evidence for the sole purpose of showing "the identity of the perpetrator of the crime in this case." N.C.G.S. § 8C-1, Rule 404(b) (Supp.1997).
The prosecutor called Deborah Thompson to the witness stand, and she testified before the jury that she had observed defendant and Ron Pierce discipline defendant's daughter, Brandy. Ms. Thompson testified that defendant removed a belt that was hanging on a coat stand, and then she and Pierce took Brandy into a bedroom and shut the door behind them. She stated that she could "hear Melanie [defendant] hollering at Brandy, and ... what sounded like the belt hitting her, and Brandy was screaming and Ron [Pierce] was laughing during the whole thing." Ms. Thompson testified that defendant had the belt in her hand when she returned from the bedroom, and then she hung it back on the coat stand.
The prosecutor next called to the stand Julia Szekely, one of defendant's neighbors, who testified that she had observed defendant discipline her son, Roger, by biting him "[r]eal hard." She testified that, as a result, Roger "was in pain. He was crying hard." Ms. Szekely also recalled that one afternoon when she was in defendant's house, defendant disciplined her daughter, Brandy, by doubling a belt in half and "smack[ing] [Brandy] with it" about five or six times. Ms. Szekely testified that Brandy "cried hard. You could tell it hurt."
At the end of their testimony, the trial court instructed the jury as follows:
Now, members of the jury, what you've heard the last two witnesses testify about the Defendant biting one or both, I mean hitting one or both of her children with a belt and biting one, this evidence was received for the sole purpose of showing, if you find that it does so, the identity of the person who committed the crime charged in this case, or that there existed in the mind of the Defendant, a plan, scheme or system or design involved in the crime charged in the case, and the absence of accident.
If you believe this evidence, you may consider it, but only for that limited purpose. You may not convict this Defendant on these charges for something she may have done in the past.
Evidence during the trial revealed that agents of the North Carolina State Bureau of Investigation retrieved two belts from defendant's house. Dr. Lantz, the forensic pathologist, testified that he could match one of the retrieved belt's buckle with the patterned abrasion-contusion on Tabitha's left knee. He determined this by viewing the leather and stitching of the belt and the angle of the metal belt buckle which were reflected in the injury on Tabitha's left leg. Dr. Lantz also found adult human bite marks on Tabitha's left thigh and buttocks. The State introduced evidence from Dr. Ernest Burkes, Jr., an expert in forensic odontology, that, in his opinion, the adult human bite marks on Tabitha's body were compatible with defendant's dental impressions.
Defendant claims that the evidence introduced during Ms. Thompson's and Ms. Szekely's testimony was inadmissible for any purpose. We disagree.
Rule 404(b) of the North Carolina Rules of Evidence provides, in pertinent part:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.
N.C.G.S. § 8C-1, Rule 404(b).
Moreover, this Court has stated that
"[t]his rule is `a clear general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.' State v. Coffey, 326 N.C. [268,] 278-79, 389 S.E.2d [48,] 54 [ (1990) ]. The list of permissible purposes for admission *310 of `other crimes' evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime."
Pierce, 346 N.C. at 490, 488 S.E.2d at 587 (quoting State v. White, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53, cert. denied, 516 U.S. 994, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995)).
The State offered evidence that defendant had previously punished her children through her use of a belt and biting, which tended to establish, first, the identity of the person who committed this crime; second, a plan; and finally, absence of accident. All of these are permissible purposes for which evidence may be offered under Rule 404(b) and are relevant in determining whether defendant committed felonious child abuse and first-degree murder by herself or acting together with someone else.
We also reject defendant's contention that the probative value of this evidence was outweighed by the danger of unfair prejudice under Rule 403 of the North Carolina Rules of Evidence, which provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
N.C.G.S. § 8C-1, Rule 403 (1992). This Court has noted that, "`[n]ecessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question is one of degree.'" State v. Wilson, 345 N.C. 119, 127, 478 S.E.2d 507, 512-13 (1996) (quoting State v. Weathers, 339 N.C. 441, 449, 451 S.E.2d 266, 270 (1994)). However, it is well established that
[t]he determination to exclude evidence on these grounds is left to the sound discretion of the trial court. "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." State v. Riddick, 315 N.C. 749, [756,] 340 S.E.2d 55[, 59] (1986).
State v. Mickey, 347 N.C. 508, 518, 495 S.E.2d 669, 676 (citation omitted), cert. denied, ___ U.S. ___, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998).
In the instant case, the trial court conducted a voir dire on the disputed evidence and concluded that the evidence was relevant and admissible. We conclude that the probative value of the evidence was not substantially outweighed by any danger of unfair prejudice and that the trial court did not abuse its discretion in admitting Ms. Thompson's and Ms. Szekely's testimony into evidence.
Defendant also claims, in a footnote to this argument in her brief, that admission of this testimony violates her rights under the Due Process and Confrontation Clauses of the United States Constitution. We note that defendant's arguments of constitutional error were not raised at trial and are thus deemed waived on appeal. State v. Call, 349 N.C. 382, 410, 508 S.E.2d 496, 519 (1998); see N.C. R.App. P. 10(b)(1).
This assignment of error is overruled.

VII.
Defendant also contends that the trial court erred in sustaining the State's objection to the testimony of two witnesses, Douglas Delp and Shelly Perry. Defendant claims that these two witnesses would have testified that defendant feared Ronald Pierce. We find no merit to this contention.
"The right of a defendant charged with a criminal offense to present to the jury his version of the facts is a fundamental element of due process of law, guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution and by Article I, Sections 19 and 23 of the North Carolina Constitution." State v. Miller, 344 N.C. 658, 673, 477 S.E.2d 915, 924 (1996). However, in this case, defendant has failed to preserve this issue for appellate review.
"It is well established that an exception to the exclusion of evidence cannot be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify." State v. Simpson, 314 N.C. 359, 370, 334 S.E.2d 53, *311 60 (1985). "[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record." Id. at 370, 334 S.E.2d at 60.
State v. Johnson, 340 N.C. 32, 49, 455 S.E.2d 644, 653 (1995) (citations omitted).
In the case at bar, the record fails to demonstrate what the witness' answers would have been had they been permitted to respond to defendant's questions. "By failing to preserve evidence for review, defendant deprives the Court of the necessary record from which to ascertain if the alleged error is prejudicial." State v. Locklear, 349 N.C. 118, 150, 505 S.E.2d 277, 296 (1998). Thus, defendant cannot show that the trial court's ruling with respect to the exclusion of this testimony was prejudicial.
This assignment of error is overruled.

VIII.
In her next assignment of error, defendant contends that the trial court committed plain error by improperly instructing the jury on acting in concert in accordance with State v. Blankenship, 337 N.C. 543, 447 S.E.2d 727 (1994), which was subsequently overruled by State v. Barnes, 345 N.C. 184, 481 S.E.2d 44, cert. denied, ___ U.S. ___, 118 S.Ct. 196, 139 L.Ed.2d 134 (1997), and cert. denied, ___ U.S. ___, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998). In Blankenship, "this Court held that for each charge of acting in concert related to a specific intent crime, the State must prove each defendant's intent to commit the specified crime." State v. Bonnett, 348 N.C. 417, 439, 502 S.E.2d 563, 578 (1998), cert. denied, ___ U.S. ___, 119 S.Ct. 909, 142 L.Ed.2d 907, 67 U.S.L.W. 3468 (1999). We note that Blankenship was filed by this Court on 9 September 1994, but the crimes committed in this case occurred in August 1994. Therefore, the acting-in-concert rule as stated in Blankenship is inapplicable to the case sub judice.
Defendant specifically complains that the instructions given by the trial court did not clearly explain to the jurors that they must find that defendant's common purpose with Pierce was to commit each and every crime charged. We disagree.
Because defendant did not object at trial, this Court's review is limited to plain error.
[T]he plain error rule ... is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has "`resulted in a miscarriage of justice or in the denial to appellant of a fair trial'" or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."
State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting United States v. McCaskill, 676 F.2d 995, 1002 (4th Cir.) (footnotes omitted), cert. denied, 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982)). "Indeed, even when the `plain error' rule is applied, `[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.'" Id. at 660-61, 300 S.E.2d at 378 (quoting Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203, 212 (1977)). After reviewing the record, we find that this is not the extraordinary case where the alleged error is so fundamental that a reversal is justified.
Defendant's argument regarding the trial court's instructions on felonious child abuse, felony murder based on felonious child abuse, and first-degree murder by means of torture fails based on this Court's holding in Pierce. In Pierce, the defendant, this defendant's co-defendant, similarly argued that the trial court erred in instructing the jury on the offenses of felonious child abuse, first-degree murder under the felony murder rule, and first-degree murder by torture, as "the court's instructions did not require *312 the jury to find that defendant possessed the requisite specific intent to commit these crimes." Pierce, 346 N.C. at 495, 488 S.E.2d at 590. This Court held that defendant's argument was without merit because "none of these crimes require specific intent." Id.
As to the first-degree murder based on premeditation and deliberation, defendant concedes that the trial court's preliminary instructions to the jurors required them to find that defendant herself must have had the specific intent to kill. Also, the trial court later repeated the jury instruction on premeditated and deliberate murder, again requiring the jurors to find that defendant had the specific intent to kill. Based on our previous holdings and the trial court's proper instructions on murder based on premeditation and deliberation, we conclude that the trial court did not commit error, much less plain error, in its instructions to the jury.
This assignment of error is overruled.

IX.
In her next assignment of error, defendant argues that the trial court committed plain error in characterizing Tabitha's death as a "murder" before the jury rendered its verdict. Defendant argues that this was an impermissible opinion on the evidence.
After instructing the jury on premeditated and deliberate murder, the trial court instructed:
Now, let me go back and say, the State is seeking the first degree murder on three different theories; that is, premeditation, deliberation, and with malice, which I've just covered.
They're also seeking, asking you to find the Defendant guilty of first degree murder on the terror theory, and the third theory ... or, excuse me. Torture. Not terror but torture, on the theory of torture.
The third theory is that, the felony murder, murder rule. And, I will go over those other two in just a minute. I've been over the first degree on premeditation and deliberation with malice.
Now, members of the jury, bear in mind, it's only one murder. It's only one killing, but there are three ways you may find this Defendant guilty of first degree murder; one, two or three ways, but again, there's only one murder.
After the trial court finished instructing the jury on the other theories of first-degree murder, it stated:
Again, members of the jury, there's one murder. There's three ways you can find the Defendant guilty of murder. You can find her guilty of either one of them, two of them or all three of them, or not, or find her not guilty on either theory.
This Court has stated in State v. Porter, 340 N.C. 320, 457 S.E.2d 716 (1995), the well-established principle that
[j]udicial expression of opinion regarding the evidence is statutorily prohibited under N.C.G.S. §§ 15A-1222 and -1232. "A remark by the court is not grounds for a new trial if, when considered in the light of the circumstances under which it was made, it could not have prejudiced defendant's case." State v. King, 311 N.C. 603, 618, 320 S.E.2d 1, 11 (1984). The burden rests upon defendant to show that the trial court's remarks were prejudicial.
Porter, 340 N.C. at 330, 457 S.E.2d at 721 (citations omitted). Based on these principles, we do not find that the trial court's remarks to the jury expressed any opinion regarding the evidence or its sufficiency.
"`[I]n determining the propriety of the trial judge's charge to the jury, the reviewing court must consider the instructions in their entirety, and not in detached fragments.'" State v. Hartman, 344 N.C. 445, 467, 476 S.E.2d 328, 340 (1996) (quoting State v. Wright, 302 N.C. 122, 127, 273 S.E.2d 699, 703 (1981)), cert. denied, 520 U.S. 1201, 117 S.Ct. 1562, 137 L.Ed.2d 708 (1997). "`[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" State v. McNeil, 327 N.C. 388, 392, 395 S.E.2d 106, 109 (1990) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973)), cert. denied, 499 U.S. 942, 111 S.Ct. 1403, 113 L.Ed.2d 459 (1991).
*313 In the present case, the trial court merely instructed the jury on the three possible theories on which a first-degree murder verdict could be based. The trial court also clearly explained in its instructions to the jurors that they could find defendant not guilty as to each of the three theories. Furthermore, at the conclusion of its instructions, the trial court stated:
Now, this Court has no opinion as to what your verdict should or should not be. And, any ruling I've made throughout the course of the trial or anything I've said to the lawyers, to the witnesses, to you, or anybody else should not be considered by you as an expression of an opinion.
Therefore, when viewed in context, we find that the trial court's remarks were not prejudicial. "[I]f a defendant is not prejudiced by a judge's remarks, they will be considered harmless." White, 340 N.C. at 297, 457 S.E.2d at 860.
Accordingly, we find no error, and defendant's ninth assignment of error is overruled.

CAPITAL SENTENCING PROCEEDING

X.
Next, defendant contends that the trial court committed plain error in allowing a portion of Dr. Robert Rollins' testimony. Pursuant to defendant's motion, defendant was sent to Dorothea Dix Hospital on 31 July 1995 for evaluation of her capacity to proceed to trial. Dr. Rollins, a forensic psychiatrist, and Dorothy Humphrey, a staff psychologist, conducted an examination of defendant and prepared a report of their findings. Dr. Rollins testified during the capital sentencing proceeding about his diagnosis of defendant. He testified that she suffered from mixed personality disorder, limited intellectual ability, and depression. On cross-examination, the prosecutor asked Dr. Rollins about his evaluation and if he had found that "[d]efendant does not have a disorder that would relieve her of her responsibility for her actions." Dr. Rollins answered that defendant did not suffer from such a disorder. Defendant did not object to this testimony.
In support of her assignment of error, defendant argues that Dr. Rollins' testimony was inadmissible because it embraces a legal term of art, "responsibility." Defendant also complains that the testimony was irrelevant and that it misled the jury into rejecting mitigating circumstances. We disagree.
This Court has stated that "[t]he trial court exercises broad discretion over the scope of cross-examination and, in a sentencing proceeding, is not limited by the Rules of Evidence." Locklear, 349 N.C. at 156, 505 S.E.2d at 299. "More specifically, the trial court must permit the State `to present any competent evidence supporting the imposition of the death penalty.'" State v. Warren, 347 N.C. 309, 325-26, 492 S.E.2d 609, 618 (1997) (quoting State v. Heatwole, 344 N.C. 1, 25, 473 S.E.2d 310, 322 (1996), cert. denied, 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 339 (1997)), cert. denied, ___ U.S. ___, 118 S.Ct. 1681, 140 L.Ed.2d 818 (1998).
In addition, in State v. Daniel, 333 N.C. 756, 763-64, 429 S.E.2d 724, 729 (1993), we stated that "testimony by medical experts relating to precise legal terms such as `premeditation' or `deliberation,' definitions of which are not readily apparent to such medical experts, should be excluded." However, the term "responsibility" is not a precise legal term with a definition that is not readily apparent. Instead, it is, in the context used here, a medical term used appropriately by an expert in the field of psychiatry to describe the effect of defendant's mental conditions on her actions. In State v. Flippen, 344 N.C. 689, 699, 477 S.E.2d 158, 164 (1996), we similarly found that a forensic pathologist's use of the term "homicidal assault" was not a legal term of art. Thus, in the case at bar, the trial court did not err in allowing Dr. Rollins' testimony.
This assignment of error is overruled.

XI.
In her eleventh assignment of error, defendant asserts that the trial court erroneously failed to submit to the jury two statutory mitigating circumstances. In particular, the trial court refused to submit the statutory mitigating circumstances that defendant was an accomplice in or accessory to *314 a capital felony committed by another person and her participation was relatively minor, pursuant to N.C.G.S. § 15A-2000(f)(4), and that defendant acted under duress or under the domination of another person, pursuant to N.C.G.S. § 15A-2000(f)(5). Defendant claims that enough evidence to support these mitigating circumstances existed, and thus, their exclusion requires a new sentencing hearing. Defendant did not specifically assign error to the trial court's failure to submit either the (f)(4) or (f)(5) statutory mitigating circumstance as directed by N.C. R.App. P. 10(a). Instead, defendant's assignment of error references the failure to submit "several" statutory mitigating circumstances. Though not mandatory, we note that defendant failed to include either of these statutory mitigating circumstances in her list of proposed mitigators that she submitted to the trial court. Defendant also did not object when the trial court failed to submit these mitigating circumstances to the jury. Nonetheless, it is well established that the "[t]rial court has no discretion as to whether to submit statutory mitigating circumstances when evidence is presented in a capital case which may support a statutory circumstance." State v. Skipper, 337 N.C. 1, 44, 446 S.E.2d 252, 276 (1994), cert. denied, 513 U.S. 1134, 115 S.Ct. 953, 130 L.Ed.2d 895 (1995).
The trial court must submit the circumstance if it is supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In sum, the test for sufficiency of evidence to support submission of a statutory mitigating circumstance is whether a juror could reasonably find that the circumstance exists based on the evidence.
State v. Fletcher, 348 N.C. 292, 323, 500 S.E.2d 668, 686 (1998) (citations omitted).
Assuming arguendo that defendant has properly preserved the trial court's failure to submit the (f)(4) mitigating circumstance for review by this Court, we conclude that sufficient evidence did not exist to support its submission. The evidence tends to show that defendant abused Tabitha by: (1) stuffing a paper towel in her mouth when she cried; (2) requiring her to stand with her head against the wall, her feet back and her arms up in the air while holding one foot in the air, with the paper towel in her mouth; (3) hitting her with various objects such as a shoe and radio antenna; (4) placing Tabitha's wet underwear on her head with the wet portion over her nose; (5) depriving her of food and drink; (6) "backhanding" her when she asked for a drink; (7) teasing Tabitha and making her cry; (8) making her support her weight by hanging on a chest of drawers, with her chin on her hands and her feet dangling, until she fell off, sometimes lasting twenty and thirty minutes, then putting her back again; (9) confining her to a dark room as a form of punishment; and (10) grabbing her and shaking her for wetting her pants. By defendant's own admission, she forced food down Tabitha's throat, shoved paper towels down Tabitha's throat to keep her from crying, struck her with a shoe, made her hang from a dresser, bit her, and deprived her of liquids. Lastly, evidence was presented that defendant called her former mother-in-law from the emergency room on the night that Tabitha died and declared, "I've killed Tabitha."
Viewing this evidence in its entirety, we cannot conclude that the (f)(4) mitigating circumstance that defendant was an accomplice in or accessory to the capital felony committed by another person and her participation was relatively minor was supported by substantial evidence. Although defendant may not have inflicted the closed-head injury on the night Tabitha died, defendant did significantly abuse Tabitha throughout her stay with defendant and Ronald Pierce and, thus, cannot be considered to have been a minor participant in such conduct. Thus, the trial court was not required to submit the (f)(4) mitigating circumstance.
We also find that there was not sufficient evidence to support the submission of the N.C.G.S. § 15A-2000(f)(5) mitigating circumstance that defendant acted under duress or under the domination of another person. Although defendant claimed that she was scared of Ronald Pierce and that he was in "complete control," the evidence reviewed above clearly indicates that defendant disciplined *315 and abused Tabitha repeatedly throughout the several weeks that Tabitha lived with defendant and Pierce. Defendant testified that, out of fear of Pierce, she told the police that the dog had injured Tabitha. However, this evidence does not show that defendant's actions of first-degree murder, torture, or felony child abuse were committed while she was under duress or the domination of Pierce.
Evidence was also introduced at trial that defendant had been involved in abusive relationships with men, including Pierce, and that Pierce had previously been criminally prosecuted for assaulting defendant. This evidence merely goes to the general aspects of defendant's relationship with Pierce and thus, fails to support defendant's assertion that she acted under the domination of Pierce on the night that Tabitha died or during the abusive events that occurred leading up to Tabitha's death. Further, the State presented evidence at the sentencing hearing that defendant's evaluation by the staff psychologist at Dorothea Dix Hospital revealed that defendant did not display the level of dependency that would be expected from one characterizing herself as so submissive.
Based upon the lack of evidence presented supporting defendant's argument that she acted under duress or the domination of Pierce, "a jury finding of this circumstance would have been based solely upon speculation and conjecture, not upon substantial evidence, and the submission of the instruction would be unreasonable as a matter of law." State v. Daniels, 337 N.C. 243, 273, 446 S.E.2d 298, 316-17 (1994), cert. denied, 513 U.S. 1135, 115 S.Ct. 953, 130 L.Ed.2d 895 (1995). Thus, taking all of the evidence as a whole, we conclude that the trial court did not err in failing to submit the (f)(5) mitigating circumstance.
This assignment of error is overruled.

XII.
Defendant next argues that she is entitled to a new sentencing hearing because the trial court erred in not ordering Ronald Pierce to testify. Specifically, in this assignment of error, defendant alleges that "[t]he trial court erred in not granting immunity and ordering to testify Ronald Pierce, inasmuch as this ruling denied the defendant's state and federal constitutional rights to present a defense, to due process of law, and to be free from cruel or unusual punishment."
Defendant subpoenaed Pierce to testify on her behalf during the sentencing phase of the trial. Pierce's convictions for first-degree murder and felonious child abuse were on appeal at the time. Pierce's appellate counsel, Ms. Margaret Ciardella, expressed to the trial court that she had counseled Pierce to plead his Fifth Amendment privilege to any questions that might incriminate him. The following exchange then ensued.
THE COURT: Then the State will want to know how he treated this child, the Pierce child.
MR. CAMERON: Unless they, are they limited, though, to what came out on direct?
THE COURT: No, sir. Then he'd have to plead the Fifth, I guess.
MRS. HARDING: And, then the State would move [to] strike all of his testimony, then, Your Honor. It's sort of self-defeating.
MS. CIARDELLA: Your Honor, if I may, I, I would submit that any, any statement from him regarding treatment of any children in [their] house would be incriminating.
Later when Pierce arrived in the courtroom, the trial court and defense counsel again discussed Pierce's potential testimony.
MR. CAMERON: ... Your Honor, we would attempt to call Mr. Pierce, however I understood ..., after talking with his counsel, that he is going to refuse to answer any questions for me. I would like it on the record.
THE COURT: Like what?
MR. CAMERON: That he refuses to testify.
THE COURT: Bring him in ... put him up here on the witness stand.
As directed by the trial court, defendant called Pierce to testify and attempted to *316 question him about the manner in which defendant treated her children. Pierce pled the Fifth Amendment to defendant's questions. Defendant indicated that she had nothing further to ask of Pierce, and the trial court instructed Pierce to step down from the witness stand. The trial court concluded the inquiry as follows:
THE COURT: Just a minute. Anything you want to say about it, Mr. Cameron?
MR. CAMERON: I believe that's all that I know how to proceed with it, at this time, Your Honor, in that respect.
Our thorough review of the transcript reveals that during the several conversations concerning Ronald Pierce's testimony, defendant never asked the trial court to order Pierce to testify under a grant of immunity. Thus, defendant has failed to preserve this argument for appellate review and may not raise it for the first time on appeal. N.C. R.App. P. 10(b)(1); see State v. Pickens, 346 N.C. 628, 641, 488 S.E.2d 162, 169 (1997). "This Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal." State v. Eason, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991).
Therefore, this assignment of error is overruled.

XIII.
In her next assignment of error, defendant contends that the trial court erred in submitting to the jury the aggravating circumstance that the killing was especially heinous, atrocious, or cruel. See N.C.G.S. § 15A-2000(e)(9) (1997). Defendant argues that the State offered insufficient evidence to support the submission of this statutory aggravating circumstance.
"In determining whether the evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravator, we must consider the evidence `in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.'" State v. Flippen, 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998) (quoting Lloyd, 321 N.C. at 319, 364 S.E.2d at 328).
"Whether a trial court properly submitted the (e)(9) aggravating circumstance depends on the facts of the case." Id. "A murder is [especially] `heinous, atrocious, or cruel' when it is a `conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" State v. Rouse, 339 N.C. 59, 97, 451 S.E.2d 543, 564 (1994) (quoting State v. Goodman, 298 N.C. 1, 25, 257 S.E.2d 569, 585 (1979)), cert. denied, 516 U.S. 832, 116 S.Ct. 107, 133 L.Ed.2d 60 (1995). "The victim's age and the existence of a parental relationship between the victim and the defendant may also be considered in determining the existence of the especially heinous, atrocious or cruel circumstance." State v. Elliott, 344 N.C. 242, 280, 475 S.E.2d 202, 219 (1996), cert. denied, 520 U.S. 1106, 117 S.Ct. 1111, 137 L.Ed.2d 312 (1997).
Applying the foregoing principles to the case sub judice, we conclude that the evidence, viewed in the light most favorable to the State, supported the submission of the (e)(9) aggravating circumstance. The State offered evidence that the victim was staying with defendant and Pierce in defendant's house while her mother remained hundreds of miles away in Pennsylvania. Defendant had assumed the role of a primary caregiver to Tabitha in the weeks preceding her death. "Evidence that the defendant was the primary caregiver of the victim also supports the (e)(9) aggravator because such a `killing betrays the trust that a baby has for its primary caregiver.'" Flippen, 349 N.C. at 270, 506 S.E.2d at 706 (quoting State v. Huff, 325 N.C. 1, 56, 381 S.E.2d 635, 667 (1989), sentence vacated on other grounds, 497 U.S. 1021, 110 S.Ct. 3266, 111 L.Ed.2d 777 (1990)). Tabitha was only two and one-half years old at the time of her death. She was vulnerable and wholly dependent on defendant and Pierce for their care and protection. Under these circumstance, Tabitha was brutally beaten and severely abused.
We hold that the trial court did not err in submitting this aggravating circumstance to the jury.
This assignment of error is overruled.

*317 XIV.
Next, defendant argues that the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad, both on its face and as applied, and thus the trial court's instruction to the jury regarding the aggravator was unconstitutional. Defendant, however, failed to object to this instruction at trial. Thus, pursuant to N.C. R.App. P. 10(b)(1), she has not properly preserved the issue for review by this Court. Likewise, defendant made no constitutional claims at trial regarding this instruction and will not be heard on any constitutional grounds now. State v. Benson, 323 N.C. 318, 321-22, 372 S.E.2d 517, 519 (1988).
Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure sets forth the necessary procedure for preserving jury instruction issues for appellate review.
A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objections; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of the party, out of the presence of the jury.
N.C. R.App. P. 10(b)(2).
Defendant failed to object to the trial court's instructions and, thus, has waived her right to appellate review of this issue. Furthermore, we will not review the alleged error under a plain-error analysis because defendant did not "specifically and distinctly" allege in her assignment of error that the trial court committed plain error. N.C. R.App. P. 10(c)(4). Lastly, this Court has consistently rejected this argument. State v. Simpson, 341 N.C. 316, 356-57, 462 S.E.2d 191, 214 (1995), cert. denied, 516 U.S. 1161, 116 S.Ct. 1048, 134 L.Ed.2d 194 (1996).
Defendant's fourteenth assignment of error is overruled.

XV.
Defendant also argues that the trial court erred by not intervening ex mero motu to strike improper arguments made by the prosecutor. Because defendant failed to object to [these statements] during the closing arguments, she "must demonstrate that the prosecutor's closing arguments amounted to gross impropriety." Rouse, 339 N.C. at 91, 451 S.E.2d at 560. "`[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting ex mero motu an argument which defense counsel apparently did not believe was prejudicial when he heard it.'" State v. Warren, 348 N.C. 80, 126, 499 S.E.2d 431, 457 (quoting State v. Johnson, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)), cert. denied, ___ U.S. ___, 119 S.Ct. 263, 142 L.Ed.2d 216 (1998). "We further emphasize that `statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred.'" State v. Guevara, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998) (quoting State v. Green, 336 N.C. 142, 188, 443 S.E.2d 14, 41, cert. denied, 513 U.S. 1046, 115 S.Ct. 642, 130 L.Ed.2d 547 (1994)).
In the case before us, the prosecutor argued:
Now, you'll recall that the questions asked of you were "Do you have any moral or religious scruples against the death penalty?" Each of you, in your own way, indicated you did not.
And, then I asked you "Do you feel like it's an appropriate punishment in some cases," and each of you said, "Yes," you did, in some cases.
You also indicated that it would be difficult for you to do, as well it should be. It's an ultimate punishment. To recommend it is the most serious thing you can do in a courtroom.
But, there are some cases where it must be done. And, if this isn't one, I can't imagine one. The law in this state will only let us ask you for a death penalty in certain very, very specific instances.

*318 We are required, indeed required, to ask you for the death penalty in certain cases. We don't have an option. And, in this particular case, we are asking you because the law says we must, but because it deserves it as well.
And, it deserves it because it has an aggravating circumstance. The aggravating circumstance in this case is just as plain as any one of those pictures is to you. The aggravating circumstance in this case is that this killing, this murder, this first degree slaughter of this child, by that woman (Points to Defendant), and Ronald Pierce, was especially heinous. It was especially atrocious, and it was especially cruel.
"`We have previously held that the prosecutor is allowed to argue the seriousness of the crime.'" State v. Lemons, 348 N.C. 335, 357, 501 S.E.2d 309, 322 (1998) (quoting State v. Barrett, 343 N.C. 164, 180, 469 S.E.2d 888, 898, cert. denied, 519 U.S. 953, 117 S.Ct. 369, 136 L.Ed.2d 259 (1996)). "Further, in addition to the wide latitude generally afforded trial counsel in jury arguments, we also recognize that `the prosecutor of a capital case has a duty to zealously attempt to persuade the jury that, upon the facts presented, the death penalty is appropriate.'" Locklear, 349 N.C. at 162, 505 S.E.2d at 303 (quoting State v. Strickland, 346 N.C. 443, 467, 488 S.E.2d 194, 208 (1997), cert. denied, ___ U.S. ___, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998)).
With these principles in mind and after reviewing the prosecutor's arguments in context, we conclude that the statements were not so grossly improper as to mandate the trial court to intervene ex mero motu. Here, the prosecutor properly argued the facts of the case and urged the jury to impose the death penalty. In doing so, the prosecutor relied on the strength of the evidence to support the especially heinous, atrocious, or cruel aggravating circumstance. See State v. McCollum, 334 N.C. 208, 227, 433 S.E.2d 144, 154 (1993) (where this Court found that the prosecutor's statement that "`I won't have the opportunity to again get in front of you and try to convince you that this is probably the most cruel, atrocious and heinous crime you'll ever come in contact with'" was proper and that the "prosecutor was not stating his personal opinion, but merely arguing that the jury should conclude from the evidence before it that the imposition of the death penalty was proper in this case"), cert. denied, 512 U.S. 1254, 114 S.Ct. 2784, 129 L.Ed.2d 895 (1994).
Defendant also complains that the prosecutor improperly stated during his jury argument that defendant "signed her own death warrant." This Court has repeatedly held that such an argument is not improper. See, e.g., Heatwole, 344 N.C. 1, 473 S.E.2d 310; State v. Walls, 342 N.C. 1, 463 S.E.2d 738 (1995), cert. denied, 517 U.S. 1197, 116 S.Ct. 1694, 134 L.Ed.2d 794 (1996); State v. Reeves, 337 N.C. 700, 448 S.E.2d 802 (1994), cert. denied, 514 U.S. 1114, 115 S.Ct. 1971, 131 L.Ed.2d 860 (1995).
We conclude that "[t]he prosecutor's comments in this case were proper in light of his role as a zealous advocate for convictions in criminal cases." McCollum, 334 N.C. at 227, 433 S.E.2d at 154. Accordingly, these remarks were not "`so prejudicial and grossly improper as to require corrective action by the trial court ex mero motu.'" Lemons, 348 N.C. at 357, 501 S.E.2d at 323 (quoting State v. James, 322 N.C. 320, 324, 367 S.E.2d 669, 672 (1988)).
This assignment of error is overruled.

XVI.
Next, defendant contends that "[t]he trial court erred in denying ... defendant's motion to dismiss, inasmuch as there was insufficient evidence to support each element of the offenses, and the ruling denied ... defendant's state and federal constitutional rights to due process of law, and to be free from cruel or unusual punishment." Defendant made a motion to dismiss at the close of the State's evidence and later renewed her motion on the same basis at the close of all the evidence. Defendant's basis for the dismissal was that there was not "any evidence linked to this defendant ... with what these doctors said to be the fatal blow, this severe head injury." The trial court denied both of defendant's motions to dismiss. Viewing the *319 evidence in the light most favorable to the State, we hold that there was sufficient evidence presented for a rational jury to find that defendant committed first-degree murder under each of the theories presentedon the basis of malice, premeditation and deliberation; on the basis of torture; and under the felony murder rule.
Defendant also assigns as error under this argument that "[t]he trial court's instruction on first degree murder did not effectively distinguish first degree murder from lesser forms of homicide, rendering the first degree murder statute unconstitutionally vague as applied to this defendant." However, we note that defendant did not raise any constitutional claims at trial and, thus, may not raise them for the first time on appeal to this Court. N.C. R.App. P. 10(b)(1); see Call, 349 N.C. at 412, 508 S.E.2d at 522.
Accordingly, defendant's assignment of error is waived.

PRESERVATION

XVII.
Defendant next raises an issue which she has properly denominated as a preservation issue and which she concedes this Court has decided against her position: The trial court erred in using "may" instead of "must" in its instructions on the capital sentencing procedure, thereby making the consideration of mitigating evidence discretionary with the jury during sentencing. Because defendant has presented no compelling reason for this Court to reconsider its position on this issue, this assignment of error is overruled. See Gregory, 340 N.C. at 417-19, 459 S.E.2d at 668-69.

PROPORTIONALITY
Having concluded that defendant's trial and separate capital sentencing proceeding were free from prejudicial error, we turn now to the duties reserved exclusively for this Court in capital cases. It is our duty according to N.C.G.S. § 15A-2000(d)(2) to ascertain: (1) whether the record supports the jury's finding of the aggravating circumstance on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
In this case, the sole aggravating circumstance submitted to and found by the jury was that the murder was especially heinous, atrocious, or cruel. See N.C.G.S. § 15A-2000(e)(9). Defendant argues that defendant's sentence of death was the result of arbitrary prosecution and capricious conduct. However, after thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstance submitted to and found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We now turn to our final statutory duty of proportionality review.
One purpose of proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." State v. Lee, 335 N.C. 244, 294, 439 S.E.2d 547, 573, cert. denied, 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994). Another is to guard "against the capricious or random imposition of the death penalty." State v. Barfield, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), cert. denied, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed.2d 1137 (1980). In proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. We have found the death penalty disproportionate in seven cases: State v. Benson, 323 N.C. 318, 372 S.E.2d 517; State v. Stokes, 319 N.C. 1, 352 S.E.2d 653 (1987); State v. Rogers, 316 N.C. 203, 341 S.E.2d 713 (1986), overruled on other grounds by State v. Gaines, 345 N.C. 647, 483 S.E.2d 396, cert. denied, ___ U.S. ___, 118 S.Ct. 248, 139 L.Ed.2d 177 (1997), and by State v. Vandiver, 321 N.C. 570, 364 S.E.2d 373 (1988); State v. Young, 312 N.C. 669, 325 S.E.2d 181 (1985); State v. Hill, 311 N.C. 465, 319 S.E.2d 163 (1984); State v. Bondurant, 309 *320 N.C. 674, 309 S.E.2d 170 (1983); State v. Jackson, 309 N.C. 26, 305 S.E.2d 703 (1983). We find that this case is distinguishable from each of these cases.
"`None of the cases found disproportionate by this Court involved the murder of a child.'" State v. Perkins, 345 N.C. 254, 291, 481 S.E.2d 25, 42 (quoting Elliott, 344 N.C. at 288, 475 S.E.2d at 224), cert. denied, ___ U.S. ___, 118 S.Ct. 111, 139 L.Ed.2d 64 (1997). Further, of the cases in which this Court has found the death penalty disproportionate, the jury found the especially heinous, atrocious, or cruel aggravating circumstance in only two cases. Stokes, 319 N.C. 1, 352 S.E.2d 653; Bondurant, 309 N.C. 674, 309 S.E.2d 170.
Neither Stokes nor Bondurant is similar to this case. Defendant here was convicted of murder on the basis of premeditation and deliberation as well as under the felony murder rule. In Stokes, the defendant was convicted solely on the basis of the felony murder rule. This Court has often emphasized that "[a] conviction based on the theory of premeditation and deliberation indicates a more calculated and cold-blooded crime." State v. Davis, 340 N.C. 1, 31, 455 S.E.2d 627, 643, cert. denied, 516 U.S. 846, 116 S.Ct. 136, 133 L.Ed.2d 83 (1995). In Bondurant, the defendant exhibited his remorse, as he "readily spoke with policemen at the hospital, confessing that he fired the shot which killed [the victim]." Bondurant, 309 N.C. at 694, 309 S.E.2d at 183. "Defendant here did not exhibit the kind of conduct we recognized as ameliorating in Bondurant." Flippen, 349 N.C. at 278, 506 S.E.2d at 711.
We conclude that this case is most analogous to cases in which this Court has held the death penalty not to be disproportionate. "In Elliott we upheld the death penalty where the defendant had assumed a parental role in caring for the young victim; the defendant had brutally beaten the victim; the defendant was convicted of first-degree murder on the basis of premeditation and deliberation; and the jury found the sole aggravating circumstance that the murder was especially heinous, atrocious, or cruel." Perkins, 345 N.C. at 291, 481 S.E.2d at 43 (citing Elliott, 344 N.C. at 289-90, 475 S.E.2d at 225).
Defendant complains that the sentencing was disproportionate in that Ronald Pierce was sentenced to life in prison, whereas defendant was sentenced to death. However, this Court has stated that "the fact that a defendant is sentenced to death while a codefendant receives a life sentence for the same crime is not determinative of proportionality." State v. McNeill, 349 N.C. 634, 655, 509 S.E.2d 415, 427 (1998). Therefore, we find no merit to this contention.
After comparing this case to other roughly similar cases as to the crime and the defendant, we cannot conclude that this death sentence is excessive or disproportionate.
Defendant received a fair capital trial and capital sentencing proceeding, free from prejudicial error. Therefore, the judgment of the trial court must be and is left undisturbed.
NO ERROR.
Justices MARTIN and WAINWRIGHT did not participate in the consideration or decision of this opinion.